The DEPARTMENT OF HEALTH AND SOCIAL SERVICES, State of Alaska, et al., Appellants, Cross–Appellees,

v.

ALASKA STATE HOSPITAL AND NURSING HOME ASSOCIATION, an Alaska non-profit corp., acting on its own behalf and on behalf of its membership, et al., Appellees, Cross–Appellants.

S–4807.

Supreme Court of Alaska.

July 16, 1993.

Glenn M. Gustafson, Asst. Atty. Gen., Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellants, cross-appellees.

Stephen D. Rose and John F. Sullivan, Inslee, Best, Doezie & Ryder, P.S., Bellevue, WA, for appellees, cross-appellants.

Before MOORE, C.J., and RABINOWITZ, BURKE, MATTHEWS and COMPTON, JJ.

COMPTON, Justice.

This case arises out of a dispute between the State of Alaska and the Alaska State Hospital and Nursing Home Association (ASHNHA) over rates paid to nursing homes under the Medicaid program. The superior court granted ASHNHA judgment on the basis that the State's plan violated the procedural requirements of the Boren Amendment. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The federal Medicaid program is designed to provide medical assistance to low-income persons by granting federal matching funds to participating states. While participation in the Medicaid program is optional, a state that elects to participate must comply with federal statutory requirements. *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 502, 110 S.Ct. 2510, 2513, 110 L.Ed.2d 455 (1990); *Colorado Health Care Ass'n v. Colorado Dep't of Social Servs.,* 842 F.2d 1158, 1164 (10th Cir.1988). One of these requirements, the Boren Amendment (Boren), governs the method by which states establish payment rates for facilities providing care under the Medicaid program. Boren provides in relevant part:

> A State plan for medical assistance must—
>
> . . . .
>
> (13) provide—
>
> (A) for payment ... of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State ...) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards....

42 U.S.C. § 1396a(a)(13)(A) (1988).

In August 1988 the State became concerned that it was in danger of losing its federal financial participation because state rates exceeded federal standards. In response to these concerns, the Alaska Medicaid Rate Commission (MRC) established an emergency regulation that provided for maximum limits on routine rates. 7 Alaska Administrative Code 43.685(g) (1988). In September 1989 thirteen long-term care facilities challenged this regulation in an administrative appeal to the Alaska Department of Health and Social Services (DHSS). While the administrative appeal was pending, eight of these facilities and ASHNHA filed suit in superior court, challenging the validity and application of section 685(g).

The superior court granted the State summary judgment as to all state law claims, based on ASHNHA's failure to exhaust its administrative remedies.[1] However, the court denied the State's summary judgment motion as to ASHNHA's 42 U.S.C. § 1983 cause of action alleging that

---

1. The superior court later reconsidered its grant of partial summary judgment and reinstated some of ASHNHA's state law claims.

section 685(g) violated Boren. The superior court later granted ASHNHA summary judgment against the State on the basis that the State failed to satisfy the "findings" requirement of Boren. The court enjoined the State from giving effect to section 685(g), and remanded the case to the administrative agency to revise the Medicaid payment rates.[2] The State appeals and ASHNHA cross-appeals on several related issues.

## II. DISCUSSION

### A. EXHAUSTION OF ADMINISTRATIVE REMEDIES

The State initially argues that ASHNHA was required to exhaust its administrative remedies prior to bringing suit under 42 U.S.C. § 1983, and that the superior court thus erred in not requiring exhaustion. In response, ASHNHA argues that *Wilder v. Virginia Hospital Association*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), disposes of this issue as it expressly holds that providers need not exhaust their state administrative remedies prior to bringing § 1983 actions to enforce Boren.

■ The standard of review applicable to this question is *de novo:* This court is not bound by a lower court's resolution of questions of law, and has the duty to adopt the rule of law most persuasive in light of precedent, reason and policy. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

■ We find that ASHNHA's reliance on *Wilder* is misplaced. *Wilder* holds only that the availability of state administrative remedies does not absolutely foreclose resort to § 1983.[3] The Court did not address the question of whether plaintiffs must exhaust available remedies *before* commencing a § 1983 action.

The Supreme Court has, however, addressed this issue in another case and ruled that exhaustion is not required. In *Patsy v. Florida Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), the Court held that "exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983." *Id.* at 516, 102 S.Ct. at 2568. Accordingly, exhaustion is not required in this case, and the decision of the trial court is affirmed.

### B. COMPLIANCE WITH PROCEDURAL REQUIREMENTS OF THE BOREN AMENDMENT

The central dispute in this case is whether the State complied with one of the procedural requirements of Boren—whether it made sufficient findings before setting maximum limits on certain rates. In addressing this issue, it is useful to briefly examine the history of the Medicaid reimbursement scheme and Boren.

As originally enacted in 1965, the Medicaid Act required states to reimburse facilities for their "reasonable costs" in providing care to Medicaid patients. Pub.L. 89–97, § 1902(a)(13)(B), 79 Stat. 286, 346 (1965). Because of rapidly escalating Medicaid costs, Congress reevaluated this approach in the early 1980s. Congress eventually concluded that the complexity, rigidity and "inflationary nature" of the reasonable cost reimbursement system was to blame for the program's rising costs. *Wilder*, 496 U.S. at 506, 110 S.Ct. at 2515. Accordingly, Congress enacted Boren in 1981, replacing the reasonable cost provision with "a provision requiring States to reimburse hospitals at rates ... that are

---

**2.** This order was stayed, however, pending resolution of this appeal.

**3.** In *Wilder* the Supreme Court noted two situations in which § 1983 claims are not available: (1) where plaintiffs seek to enforce a statute that does not create enforceable rights, privileges or immunities, and (2) where Congress has foreclosed enforcement of the statute. *Wilder*, 496 U.S. at 508, 110 S.Ct. at 2516. The Court addressed the availability of state administrative

remedies in the context of the second exception. Virginia had argued that "the existence of administrative procedures whereby health care providers can obtain review of individual claims for payment evidences an intent to foreclose a private remedy in the federal courts." *Id.* at 523, 102 S.Ct. at 2571. The Supreme Court rejected this argument, holding that "Congress did not foreclose a private judicial remedy under § 1983." *Id.*

reasonable and adequate to meet the cost which must be incurred by efficiently and economically operated facilities...." S.Rep. No. 139, 97th Cong., 1st Sess. 478 (1981), *reprinted in* 1981 U.S.C.C.A.N. 396, 744.

In shifting to this new, more flexible approach, Boren expressly delegated authority to the states to alter their Medicaid plans and to establish the rates under which providers will be paid. For example, states are free "to establish statewide or classwide rates, establish rates based on a prospective cost, or include incentive provisions to encourage efficient operation." *Wilder*, 496 U.S. at 506–07, 110 S.Ct. at 2515–16 (footnote omitted). Commenting on Congress's intent in enacting Boren, one federal appeals court noted that:

> The Boren Amendment was enacted with two specific purposes in mind: (1) to provide the states with greater flexibility in developing methods of reimbursing skilled nursing facilities, intermediate care facilities, and inpatient hospital services; and (2) to increase the economy and efficiency of all plans.

*Pinnacle Nursing Home v. Axelrod*, 928 F.2d 1306, 1309–10 (2d Cir.1991).

While states have considerable flexibility in establishing rates under Boren, it is clear that this flexibility is not absolute. As the United States Supreme Court noted, "[i]n passing the Boren Amendment, Congress sought to decentralize the method for determining rates, but not to eliminate a State's fundamental obligation to pay reasonable rates." *Wilder*, 496 U.S. at 515, 110 S.Ct. at 2520. Accordingly, states must still comply with certain procedural

and substantive requirements. Boren requires states to make findings and give assurances to the federal government that the rates they set "are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." 42 U.S.C. § 1396(a)(13)(A) (1988). In addition to these procedural requirements, the Supreme Court has held that the rates adopted must be actually reasonable and adequate.[4] *Wilder*, 496 U.S. at 514–15, 110 S.Ct. at 2519–21.

Boren therefore creates a tension between the need to creatively cut costs and stimulate the efficiency of providers, and the obligation to provide adequate care to Medicaid patients. The difficulty in resolving this tension is exacerbated by the failure of Boren to define any of its terms (such as "reasonable and adequate," or "efficiently and economically operated facilities"), and the refusal of the Health Care Financing Administration (HCFA) to require the states to define the terms. *See Lett v. Magnant*, 965 F.2d 251, 253 (7th Cir.1992); 48 Fed.Reg. 56049 (December 19, 1983). Not surprisingly, the ambiguity of these terms, as well as the conflicting goals of increasing efficiency and providing adequate care, has created considerable litigation between providers and state agencies. *See, e.g.*, James J. Kennedy III, *The Medicaid Program: Vague Standards Breed Litigation*, 28 St. Louis U.L.J. 351 (1984).

### 1. Standard of Review

■ The standard applicable to our review of the superior court's summary judg-

---

**4.** In finding this substantive requirement, the Court stated:

> [T]he only plausible interpretation of the amendment is that by requiring a State to *find* that its rates are reasonable and adequate, the statute imposes the concomitant obligation to adopt reasonable and adequate rates.

*Wilder*, 496 U.S. at 514–15. The Court went on to note that "[w]hile there may be a range of reasonable rates, there certainly are *some* rates outside that range that no State could ever find to be reasonable and adequate under the Act." *Id.* at 519–20, 110 S.Ct. at 2522. *See also* Note, *Medicaid, State Cost–Containment Measures,*

*and Section 1983 Provider Actions Under Wilder v. Virginia Hospital Association,* 45 Vand.L.Rev. 487, 508 (1992).

Since the trial court in this case found that the State violated the procedural requirements of Boren, the court did not consider whether the rates adopted were actually reasonable and adequate. Accordingly, the issue of the State's substantive compliance with Boren is not before this court. It should be noted, however, that a trial court must reach the issue of substantive compliance if the court finds that the procedural requirements were met. *See Wilder*, 496 U.S. at 513–15, 110 S.Ct. at 2519–20.

ment order is *de novo*. *McGrath v. University of Alaska*, 813 P.2d 1370, 1371 n. 1 (Alaska 1991). We must determine whether a material issue of fact exists, and whether the moving party was entitled to judgment as a matter of law. *Darling v. Standard Alaska Prod. Co.*, 818 P.2d 677, 679 n. 5 (Alaska 1991), *cert. denied*, ___ U.S. ___, 112 S.Ct. 1176, 117 L.Ed.2d 421 (1992).

Since the central issue in this case is whether the State complied with federal law, the focus of the inquiry is on statutory interpretation. The appropriate standard of review in this context is the substitution of judgment standard provided the issue does not involve agency expertise. *Phillips v. Houston Contracting, Inc.*, 732 P.2d 544, 546 (Alaska 1987). While conceding that this standard is appropriate for the questions of statutory interpretation raised by this appeal, the State nevertheless insists that this court should give deference to the state agency's findings because the agency has "specialized knowledge of Medicaid regulation." Accordingly, the State argues that the MRC and DHSS "rate-setting functions and determinations as to the level of Medicaid payments" should be evaluated under the reasonable basis test.

Responding to a similar argument, the United States Court of Appeals for the Tenth Circuit held that state agency determinations are entitled to deference *only* if they have met the requirements of federal and state law. *AMISUB (PSL), Inc. v. State of Colorado Dep't of Social Servs.*, 879 F.2d 789, 795 (10th Cir.1989), *cert. denied*, 496 U.S. 935, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990). The court noted:

> "Our *first* inquiry is whether the payment to the appellants ... resulted in noncompliance with the federal statute and regulations." This is an issue of law, subject to *de novo* review in federal court.

*Id.* (quoting *Colorado Health Care Ass'n v. Colorado Dep't of Social Servs.*, 842 F.2d 1158, 1165 (10th Cir.1988) (emphasis added)).[5] Since the issue before this court is whether the State complied with the procedural requirements of the Boren Amendment, the agency's determination of its own compliance is not entitled to deference.[6]

### 2. The Procedural Requirement & the AMISUB Test

At issue in this case is whether the State made adequate "findings" under Boren pursuant to implementing its plan.[7] ASH-

---

**5.** The State argues that the *AMISUB* court's approach "represents, at most, a minority rule" that is inconsistent with the decisions of numerous other courts. While it is true that courts have been less than consistent in applying standards of review to Medicaid payment schemes, the cases cited by the State do not necessarily contradict *AMISUB*. For example, although the United States Court of Appeals for the Fifth Circuit applied a deferential standard to a payment scheme, it also noted that "[a] district court can, of course, decide whether federal law has been violated." *Mississippi Hosp. Ass'n, Inc. v. Heckler*, 701 F.2d 511, 516 (5th Cir.1983). If a state agency has complied with the requirements of federal law, it is entitled to deference. However, the initial determination of whether the agency complied with federal law is *not* entitled to deference.

**6.** The standard applicable to a review of a state's *substantive* compliance with Boren is somewhat more deferential. The Supreme Court noted that:

> the Courts of Appeals generally agree that when the State has complied with the procedural requirements imposed by the amend-

ment and regulations, a federal court employs a deferential standard of review to evaluate whether the rates comply with the substantive requirements of the amendment.

*Wilder*, 496 U.S. at 520 n. 18, 110 S.Ct. at 2523 n. 18. *See, e.g., AMISUB*, 879 F.2d at 799–800. Since the superior court in this case did not reach the question of whether the State's plan met the substantive requirements of Boren, the deferential standard of review should not be applied.

**7.** In addition to the findings requirement, Boren also requires the State to make assurances to the federal government that its rates are reasonable and adequate. 42 U.S.C. § 1396a(a)(13)(A) (1988). However, primary responsibility for the development of rates and the findings on which they are based remains with the State. The Secretary "reviews only the reasonableness of the assurances provided by a State and not the State's findings themselves." *Wilder*, 496 U.S. at 507–08, 110 S.Ct. at 2516–17 (citing 42 CFR § 447.256(2) (1989)).

NHA relies heavily on the interpretation of this requirement announced in *AMISUB:*

> The plain language of federal Medicaid law mandates the State Medicaid Agency, *at a minimum,* to make "findings" which identify and determine (1) efficiently and economically operated hospitals; (2) the costs that must be incurred by such hospitals; and (3) payment rates which are reasonable and adequate to meet the reasonable costs of the state's efficiently and economically operated hospitals.

879 F.2d at 796. This language is quoted widely by other courts considering this issue, and has emerged as the standard for judging compliance with the findings requirement of Boren. *See, e.g., Pinnacle Nursing Home v. Axelrod,* 928 F.2d 1306, 1314 (2d Cir.1991); *Multicare Medical Ctr. v. Washington,* 768 F.Supp. 1349 (W.D.Wash.1991); *Folden v. Washington State Dep't of Social and Health Servs.,* 744 F.Supp. 1507 (W.D.Wash.1990).

Notwithstanding this wide-spread acceptance, the State argues that the *AMISUB* test employs an overly rigid three-step analysis that is not warranted by the "plain language" of Boren.[8] The State contends that under a less rigid application of *AMISUB,* the record demonstrates that its rate-setting procedures amply satisfied the procedural requirements of Boren. ASHNHA, in contrast, argues that the three-step test of *AMISUB* correctly reflects the procedural requirements of Boren and that the State failed to comply with these requirements.[9]

In our opinion the *AMISUB* test unnecessarily restricts states' flexibility by requiring a specific approach to determining the reasonableness of rates. In particular, we do not subscribe to the first prong of the test, which requires states to specifically identify which providers are efficiently and economically operated. A requirement that a state identify existing facilities that are efficiently operated assumes *a priori* that such facilities exist. However, this assumption is not warranted by the Boren Amendment, and may not accurately reflect a given state's situation.

For example, a state, after making empirical studies of its facilities, could determine that none of its facilities is "efficiently and economically operated." In other words, a state might determine that *all* of its facilities could further cut costs and increase their efficiency. Under *AMISUB*'s mandatory language, this state would be in violation of Boren if it failed to classify some of its facilities as "efficiently and economically operated."

And yet a state in this situation should be in compliance with the procedural requirements of Boren if, after making findings to this effect, it sets rates with reference to a *hypothetical* facility. In *Wilder* the Supreme Court noted that Boren "requires the State, in making its findings, to judge the reasonableness of its rates against the objective benchmark of an 'efficiently and economically operated facility.'" *Wilder,* 496 U.S. at 519, 110 S.Ct. at 2522. Commenting on this concept of an objective benchmark, Justice Blackmun (who formed part of the *Wilder* majority) stated that:

> [The Boren Amendment] defines a "reasonable and adequate" rate by referring to what *would* be provided by a *hypothetical* facility—one that operates "efficiently and economically," "compli[es] with federal and state standards," and

---

8. While the State does not directly argue that the test articulated in *AMISUB* is incorrect, several of its points lead to that conclusion. This position is clearly a minority one. Although the United States Court of Appeals for the Seventh Circuit recently suggested that *AMISUB* is not the only test available under Boren, *Illinois Health Care Association v. Bradley,* 983 F.2d 1460 (7th Cir.1993), no other court has ever challenged *AMISUB.* Further, at least one federal district court has explicitly rejected the argument that *AMISUB* misstates the statutory standard under Boren. *Multicare,* 768 F.Supp. at 1391.

9. ASHNHA points out that the State's own witnesses admitted they made no attempt to identify which Alaska facilities were efficiently and economically operated. In addition, ASHNHA asserts that the State failed to make findings that established a nexus between the costs of operating efficient and economic facilities and the proposed reimbursement rates.

"ensur[es] 'reasonable access' to eligible participants."

*Suter v. Artist M.,* — U.S. —, —, 112 S.Ct. 1360, 1373, 118 L.Ed.2d 1 (1992) (Blackmun, J. dissenting). This language, and "the legislatively mandated flexibility provided to States under the statute," 48 Fed.Reg. 56049 (December 19, 1983), allows a state in the above situation to set rates with reference to a hypothetical facility, rather than following the *AMISUB* approach.

■■■ The conclusion that the State *may* set rates with reference to a hypothetical facility does not mean, however, that the State *must* do so. Boren does not require that the State follow this or any other specific approach to determining the reasonableness of rates. In fact, the State could decide to follow the *AMISUB* approach and base its rates on an actual facility (or facilities) that it determines to be efficiently and economically operated.[10] Boren grants states the flexibility to set their own methods and standards, and the authority to make their own determinations as to the appropriate factors to be considered in determining rates. *Wilder,* 496 U.S. at 506–07, 110 S.Ct. at 2515–16. Recently, the United States Court of Appeals for the Seventh Circuit reached a similar conclusion regarding the *AMISUB* test:

> The Amisub approach satisfied the Tenth Circuit and deserves consideration, but we do not adopt it as a mandatory test. As the Tenth Circuit recognized, "a state is free to create its own method for arriv-

ing at the required findings." 879 F.2d at 797. We agree.

In particular we reject the notion that a state must identify a reasonable sample of particular existing nursing homes as paradigms of efficiency; such a task may be impossible.... A state must determine in its own way what it would consider to be efficient and economic nursing facilities and "must make findings which establish a nexus between the costs of operating" those facilities and "the proposed reimbursement rates under the state plan." *Pinnacle Nursing Home v. Axelrod,* 928 F.2d 1306, 1314 (2d Cir.1991).

*Illinois Health Care Ass'n v. Bradley,* 983 F.2d 1460, 1464–65 (7th Cir.1993).

On the basis of our analysis, we decline to read the findings requirement of Boren as mandating the exclusive three-part test set out by *AMISUB.* This conclusion is consistent with Congress's intent to "give States greater latitude in developing and implementing alternative reimbursement methodologies that promote the efficient and economical delivery of such services." H.R.Rep. No. 158, 97th Cong., 1st Sess., Vol. 2, at 293 (1981).

■ Although Boren does not require a specific findings process, it does set out several factors which a state must consider in determining methods for calculating rates:

(1) the unique situation (financial and otherwise) of a hospital that serves a

---

**10.** While the State is free to adopt this general approach, it should avoid interpreting the *AMISUB* test in a way contrary to Boren. The third prong of the *AMISUB* test, for example, requires states to determine rates that meet the "reasonable costs of the state's efficiently and economically operated hospitals." *AMISUB,* 879 F.2d at 796. This prong is inconsistent with Boren to the extent that it suggests that states must pay the "reasonable costs" of services actually provided by "efficient" hospitals.

In this case, for example, ASHNHA interprets the third prong as follows: "The Boren Amendment requires that only those facilities which the state determines to be 'efficiently and economically' operated must be paid rates that are adequate to meet their costs." This interpretation reflects a misunderstanding of the language and intent of Boren. Responding to a similar

argument, the United States Court of Appeals for the Seventh Circuit concluded that the hospital's approach.

> rests on the false premise that a state is required to reimburse any efficient and economic facility for its reasonable, actual costs. This merely transmutes the post-Boren prospective rate-setting approach into the pre-Boren retrospective "reasonable cost" standard.

*Lett v. Magnant,* 965 F.2d 251, 256 (7th Cir. 1992); *see also Mary Washington Hosp., Inc. v. Fisher,* 635 F.Supp. 891, 899 (E.D.Va.1985) ("the premise that a hospital is entitled under the new law to be recompensed its reasonable costs unless it is inefficient or uneconomical ... reflects a misunderstanding of [the Boren Amendment]").

disproportionate number of low-income patients, (2) the statutory requirements for adequate care in a nursing home, and (3) the special situation of hospitals providing inpatient care when long term care at a nursing home would be sufficient but is unavailable.

*Wilder,* 496 U.S. at 519 n. 17, 110 S.Ct. at 2522 n. 17 (citing 42 U.S.C. § 1396a(a)(13)(A) (1988)). At the very least, these factors require states to inquire into the actual operation of existing facilities before establishing an objective benchmark.[11] The Second Circuit has held that "the state must make findings which establish a nexus between the costs of operating efficient and economic nursing facilities and the proposed reimbursement rates under the state plan." *Pinnacle Nursing Home v. Axelrod,* 928 F.2d 1306, 1314 (2d Cir.1991).[12]

■ In our view, the findings requirement of Boren is designed to ensure that rates are not set arbitrarily, i.e., without proper consideration of the costs of operating a facility in the state. Therefore, we conclude that states must make concrete findings, based on studies of existing facilities, and use these studies to establish, with reference to either existing or hypothetical facilities, an "objective benchmark of an 'efficiently and economically operated facility.'" *Wilder,* 496 U.S. at 519, 110 S.Ct. at 2522.

■ Applying this approach to the facts of this case, we reach the same conclusion that the trial court reached:[13] The State failed to comply with the findings requirement of Boren. The State simply did not make sufficient findings to be able to establish an objective benchmark of "an efficiently and economically operated facility." The testimony of the State's witnesses indicates that the State began with an assumption that

> whatever costs were incurred by a facility in its base year were costs that it reasonably incurred as an efficiently and economically operated facility. That is, staff assumes that a facility operated efficiently and economically in its base year.

The State then inflated the base year costs to the rate year in question, compared these costs to the weighted average of costs from other facilities in the same class, and set the actual total rates on this basis.

The trouble with the State's approach is the assumption on which it is based—that facilities operated efficiently in their base year. Such an assumption may ease the State's rate-setting work by readily providing a point of comparison, but it cannot satisfy the requirement that the states "find" rates that must be incurred by efficiently and economically operated facilities. The practical result of such an approach would be to arbitrarily set a floor (the base year costs inflated yearly) on the rates paid to Medicaid providers. This approach does not comply with the requirements of Boren and is not consistent with its goal of lowering the system's costs while continuing to provide reasonable access to quality care.

It is apparent that the State has presented "no evidence at all that [it] has found any nexus between its chosen percentiles and costs of operating an efficient and economical facility." *Illinois Health Care*

---

11. For example, the United States Court of Appeals for the Third Circuit recently found that the findings requirement was not satisfied where the state had

> made no findings based on empirical studies "on such matters, for example, as the characteristics of an efficient and economical hospital operation, the impact of the proposed reimbursement rates upon hospitals' ability to survive, etc. . . . ."

*Temple University v. White,* 941 F.2d 201, 210 (3d Cir.1991) (quoting *Temple University v. White,* 729 F.Supp. 1093, 1100 (E.D.Pa.1990)), *cert. denied,* — U.S. —, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992).

12. Although *Pinnacle* relied on the test articulated in *AMISUB,* this reliance does not preclude our use of the opinion's general reasoning.

13. In reaching its conclusion, the superior court applied the *AMISUB* test. As noted, this test essentially requires states to specifically "identify and determine" which facilities are efficiently and economically operated. Since the State in this case admitted that it did not attempt to concretely identify which facilities were efficiently operated, the superior court determined that the State failed to comply with the findings requirement of Boren.

*Ass'n v. Bradley*, 776 F.Supp. 411, 419 (N.D.Ill.1991), *aff'd*, 983 F.2d 1460 (7th Cir. 1993). While the choice of certain base year rates *may* represent the costs that must be incurred by an efficient and economical facility, the State has made no findings that this is so.[14]

### 3. *The State's Ancillary Arguments*

The State further argues that (1) the State's compliance with the procedural requirements cannot reasonably be questioned since the rates were set at the maximum allowable rate under federal law and (2) it was error for the court to invalidate the plan without considering whether the regulation resulted in substantively inadequate rates.

■ The State's first argument is based on a recent decision by a federal magistrate which held that when a state sets rates to comply with the federal upper limit, "they comply with the Boren amendment as a matter of law." *Connecticut Hosp. Ass'n v. O'Neill*, No. N–90–714 (WWE), slip op. at 8 (D.Conn. Oct. 31, 1991). Although a federal district court later overruled this decision, the State nevertheless argues that this reversal did not upset the "rule of law." *See Connecticut Hosp. Ass'n v. O'Neill*, 793 F.Supp. 47, 51–52 (D.Conn.1992). It is difficult to see how a decision by a federal magistrate in Connecticut on a 12(b)(6) motion, which was later overruled, establishes a "rule of law" which should persuade this court. Further, the conclusion that the State's compliance with Boren cannot be questioned where rates are set at the upper limits ignores Congress's intent that states make findings regarding the operation of their facilities.

An agency regulation establishing limits on reimbursement cannot simply do away with the statutory requirements of Boren. In some situations rates found to be "necessary" under Boren may be higher than the rates allowed under the federal limits. However, a state in this position may qualify for an exception to the upper limits which would allow it to utilize the "necessary," higher rate.[15] While state agencies are entitled to deference with respect to their upper limits determination, this deference does not mean that they can ignore the requirements of Boren. The State is not excused from complying with Boren just because the State is concerned that it may have a problem with the federal upper limits.

■ The State's second argument is that the trial court erred by invalidating the plan without considering its substantive compliance with Boren. This argument is likewise without merit. Although the *Wilder* decision held that Boren granted both procedural and substantive rights, it did not require a court to consider substantive compliance where procedural compliance was lacking. The Court did hold, however, that procedural compliance alone was insufficient, i.e., that courts must consider substantive compliance if the procedural requirements were met. *See Wilder*, 496 U.S. at 512–15, 110 S.Ct. at 2518–21. In this case, the superior court concluded that since the plan failed to meet the procedural requirements of Boren, the court need not address the issue of substantive compliance. This conclusion is consistent with the approach of other courts and is a correct interpretation of Boren. *See Pinnacle Nursing Home v. Axelrod*, 928 F.2d 1306, 1316–17 (2d Cir.1991) (invalidating a state plan on the basis that it violated the procedural requirements without considering

---

**14.** In fact, from a practical standpoint the State's methodology may be more useful for identifying inefficient providers than efficient ones. For example, if a facility has demonstrated costs well above the weighted average of facilities in the same class, one might reasonably conclude that it is inefficient. However, it is more difficult to conclude that a facility operating at or just below the mean is efficient. Without more specific information about the various facilities it is impossible to draw any meaningful inferences about where the state should set its objective benchmark of efficiently

operated facilities. *See Bradley*, 776 F.Supp. at 421 n. 22 ("[A] showing that the *most* economically and efficiently operated firm in an industry can make a go of it at a stated price tells nothing about whether the No. 2 firm does or does not meet the objectively stated statutory standard.").

**15.** *See* 42 C.F.R. § 413.30(e), .30(f) (allowing exemptions and exceptions to the upper limit on reimbursement).

substantive compliance); *Volk v. Oregon,* 799 P.2d 658, 662 (Or.App.1990) ("We conclude that the procedural requirements of the Act are separate from the substantive requirement....").

Accordingly, we affirm the superior court's grant of summary judgment to ASHNHA.

## C. FAILURE TO AWARD ASHNHA ITS FULL ATTORNEY'S FEES

■ The standard of review applicable to the trial court's award of attorney's fees is whether the trial court abused its discretion. *See, e.g., Thorstenson v. ARCO Alaska, Inc.,* 780 P.2d 371, 376 (Alaska 1989); *Cooper v. Carlson,* 511 P.2d 1305, 1309 (Alaska 1973). Abuse of discretion will be found where the reviewing court has a definite and firm conviction that a mistake has been made. *Pugil v. Cogar,* 811 P.2d 1062, 1065 n. 5 (Alaska 1991).

ASHNHA argues that the court erred in applying the partial award provisions of Alaska Civil Rule 82, rather than awarding the full amount of attorney's fees pursuant to 42 U.S.C. § 1988 (1988). ASHNHA asserts that § 1988 requires a trial court to award the full amount of a successful plaintiff's fees. In response, the State argues that § 1988 does not entitle a successful plaintiff to full attorney's fees, but only to a reasonable fee determined in the court's discretion. The State contends that the court properly exercised its discretion under § 1988 and under Alaska Rule 82 in awarding ASHNHA 40% of its total fees.

■ The State is correct that § 1988 does not guarantee an award of full attorney's fees. Section 1988 provides that "the court, *in its discretion,* may allow the prevailing party ... a *reasonable* attorney's fee as part of the costs." 42 U.S.C. § 1988(b) (1988) (emphasis added); *see also Ferdinand v. Fairbanks,* 599 P.2d 122, 126 n. 12 (Alaska 1979) ("We cannot, however, agree with appellants that [§ 1988] *requires* an award of the full amount of fees claimed, but only those fees that are reasonable."). However, we have noted that "[f]ull attorney's fees are the norm under 42 U.S.C. § 1988." *Moseley v. Beirne,* 626 P.2d 580, 581 (Alaska 1981). In addition, this court has stated

> [w]hile the award of attorney's fees under both the Alaska Rule [82] and the federal statute [§ 1988] remains within the trial court's discretion, that discretion is narrowly limited when attorney's fees are awarded pursuant to the federal act, and will be reviewed on appeal in light of federal rather than Alaska law.

*Ferdinand,* 599 P.2d at 125.

■ Since the trial court's summary judgment decision was based on federal law, the award of attorney's fees should have been made pursuant to § 1988. Although the trial court cited both § 1988 and Alaska Rule 82 in its order awarding 40% of ASHNHA's actual costs, it did not discuss its reasons for refusing to award 100% of ASHNHA's fees. The United States Supreme Court has held that the fee amount must be determined on the facts of each case, and has noted that Congress has identified twelve factors appropriate for such a determination. *Hensley v. Eckerhart,* 461 U.S. 424, 429–30, 103 S.Ct. 1933, 1937–38, 76 L.Ed.2d 40 (1983) ("the House Report ... refers to 12 factors set forth in *Johnson v. Georgia Highway Express, Inc.,* [488 F.2d 714, 717–19 (5th Cir. 1974) ]"). The order of the superior court does not indicate that it looked to these factors in setting the award. In fact, the order provides no explanation as to how or why the court arrived at the 40% figure. Although the court has discretion in determining the amount of the fee award, "[i]t remains important, however, for the district court to provide a concise but clear explanation of its reasons for the fee award." *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941.

The court's failure to comply with federal law in setting the fee award constitutes an abuse of discretion. Accordingly, the case is remanded for a redetermination of ASHNHA's reasonable fees under § 1988.

## D. STAY OF PROCEEDINGS

Following the superior court's order invalidating section 685(g), the State obtained a stay of this order pending resolution of the appeal. On cross-appeal, ASHNHA challenges the propriety of this stay.

The appropriate standard of review is whether the trial court abused its discretion in granting the stay. *Powell v. Anchorage*, 536 P.2d 1228, 1229 (Alaska 1975). ASHNHA argues that the court erred in granting the stay because the State failed to meet any of the requirements necessary to qualify for a stay. The State argues that this court should avoid deciding this issue since this court's decision on the merits will render the issue moot.

This court will ordinarily refrain from deciding questions "where the facts have rendered the legal issues moot." *Hayes v. Charney*, 693 P.2d 831, 834 (Alaska 1985) (quoting *Doe v. State*, 487 P.2d 47, 53 (Alaska 1971)). Under the public interest exception, however, we will sometimes reach an otherwise moot issue. *Doe*, 487 P.2d at 53. The court considers the following factors in applying this exception:

> 1) whether the disputed issues are capable of repetition, 2) whether the mootness doctrine, if applied, may repeatedly circumvent review of the issues and, 3) whether the issues presented are so important to the public interest as to justify overriding the mootness doctrine.

*Hayes*, 693 P.2d at 834. These factors are not "strictly determinative," and the determination of whether to review a moot question is ultimately within the discretion of the court. *Id.*

We conclude that the public interest exception to the mootness doctrine is inapposite. Thus we do not address the propriety of the stay.[16]

## III. CONCLUSION

The superior court was correct in concluding that exhaustion of administrative remedies is not required as a prerequisite to filing an action under 42 U.S.C. § 1983. Furthermore, we agree that the State failed to comply with the procedural requirements of Boren. The court's grant of summary judgment is therefore AFFIRMED.

The superior court abused its discretion, however, in awarding ASHNHA 40% of its attorney's fees under 42 U.S.C. § 1988. Although § 1988 does not require the award of full fees, the court must apply the factors provided under federal law, and must articulate its reasons for reducing the fee award. Accordingly, the trial court's decision as to attorney's fees is VACATED and REMANDED for redetermination.

---

**16.** ASHNHA also argues as cross-appellant that the court erred in considering certain affidavits which the State offered in opposition to ASHNHA's motion for summary judgment. Since the court granted ASHNHA's motion, it is not clear why ASHNHA has asked this court to review this decision, or what type of remedy it seeks. Even if the admission of the affidavits was erroneous, the admission was not prejudicial to ASHNHA. *See Nome 2000 v. Fagerstrom*, 799 P.2d 304, 311–12 (Alaska 1990) (allegation of erroneous admission of evidence was moot where evidence did not affect outcome).